## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KARL ROSEBORO,

*Petitioner,*

v.

KEN HOLLIBAUGH, et al.,

*Respondents.*

CIVIL ACTION
NO. 22-3377

Pappert, J.                                                                February 14, 2025

## MEMORANDUM

    Karl Roseboro, currently serving a life sentence for first-degree murder, seeks a writ of habeas corpus under 28 U.S.C. § 2254.  Magistrate Judge Lynne A. Sitarski issued a Report and Recommendation recommending denial of Roseboro's petition, to which Roseboro objected.  After thoroughly reviewing the record, the Court overrules the objections, adopts the R&R and denies the petition.

I

A

    At around 2 a.m. on August 4, 2012, Karl Roseboro walked past a corner store at the intersection of Wayne Avenue and Brunner Street in the Nicetown neighborhood of Philadelphia.  (Jury Trial Tr. Sept. 9 at 40:9–41:19.)  A store security camera recorded him and Rhonda Williams, a resident of the neighborhood, walking south on Wayne, and then out of the camera's view.  (*Id.*; *id.* at 156:12–157:10; Jury Trial Tr. Sept. 10 at 26:17–27:11.)  Less than thirty seconds later, four popping sounds are heard on the surveillance video.  (Prelim. H'rg Tr. at 83:22–84:9; Jury Trial Tr. Sept. 10 at 46:19–

1

50:13.)[1]  At 2:09:44, a 911 caller reported gunshots and a woman screaming in an alley near Wayne and Brunner.  (Jury Trial Tr. Sept. 10 at 23:12–24:16.)  Police arrived in the area at 2:13:37 and at 2:29 reported finding Williams's body in an alleyway on the west side of Wayne, fifty-five feet beyond view of the security camera.  (*Id.* at 23:21–25:21; Jury Trial Tr. Sept. 9 at 108:23–109:6, 156:5–157:14.)  Williams had been shot four times: once in the right forearm, and three times in the head.  (Jury Trial Tr. Sept. 11 at 10:14–24.)

1

Four lay witnesses testified for the Commonwealth: Tyheem Williams, Rhonda Williams's son, (Jury Trial Tr. Sept. 11 at 39:14–40:8);[2] Roseboro's girlfriend, Shaquilla Harmon, who was also a cousin of Williams's, (Jury Trial Tr. Sept. 10 at 99:13–101:24); Dominique Jackson, Williams's daughter's best friend, (*id.* at 145:4–146:17); and Lydia Negron, a friend of Williams who lived in the neighborhood, (*id.* at 174:23–174:16, 197:21–24).  Harmon and Tyheem testified that Roseboro sold crack on the 1800 block of Brunner and that Williams, who was a crack addict, sometimes obtained drugs from him.  (*Id.* at 103:12–106:17, 110:16–111:9; Jury Trial Tr. Sept. 11 at 41:8–21, 44:24–45:13.)

Tyheem also told the jury about a conversation with Roseboro in the afternoon of August 4 outside of Negron's house.  According to Tyheem, he, his sister, Jackson and

---

[1]    The corner store had two exterior cameras, one across the street on the east side of Wayne and one on 1900 block of Brunner on the same side of the street as the store.  (Jury Trial Tr. Sept. 10 at 26:13–25.)  Both captured Roseboro and Williams and were played at trial, but due to the manner in which the audio surveillance was set up, only the video from the camera on Wayne included audio. (*Id.* at 35:6–36:3.)

[2]    To avoid confusion between family members, the Court refers to the victim as Williams and her son as Tyheem, to whom witnesses at trial often referred by his nickname, Randy.  *See* (Jury Trial Tr. Sept. 10 at 194:16–18.)

Roseboro were outside the house when someone asked Roseboro where he was at the time of Williams's murder. (Jury Trial Tr. Sept. 11 at 55:14–60:5.) Roseboro first said he "wasn't around," then said he had seen Tyheem on Germantown Avenue at the time of the murder. (*Id.* at 60:6–18.) But Tyheem, who admitted that he'd been drinking and smoking PCP the night of August 3, told the jury he'd only seen Roseboro sometime between 10 p.m. and midnight, not around 2 a.m. on August 4. (*Id.* at 46:12–49:1, 49:19–22, 61:17–62:12.) Tyheem also explained that this conversation was prompted by his hearing a rumor that Roseboro was involved in his mother's murder and that in addition to denying it, Roseboro told Tyheem that he'd lost his own mom. (*Id.* at 60:24–61:15.) [3] Tyheem, Jackson and Negron described Roseboro's demeanor as scared or nervous and said they never again saw him in the area. (*Id.* at 63:5–64:8.)[4]

Harmon wasn't present for the August 4 afternoon conversation, but she told the jury that when she picked Roseboro up from a neighborhood bar to go home sometime between midnight and 1 a.m. that morning, they argued because he didn't want to leave yet. (Jury Trial Tr. Sept. 10 at 113:18–116:7.) He was "aggressive" during the conversation, so she left him in the neighborhood and made the five- to ten-minute drive to their home without him. (*Id.* at 108:2–110:11, 116:11–17.)[5]

---

[3]    Jackson, Negron and Tyheem's accounts all differed slightly. Jackson recalled Roseboro saying first that he was at one neighborhood bar, then at a different bar, and finally that he was with Tyheem. (Jury Trial Tr. Sept. 10 at 150:7–154:6.) And Negron recalled Jackson being across the street at the time Roseboro told Tyheem he wasn't in the neighborhood at the time of the murder. (*Id.* at 179:17–181:11.)

[4]    Harmon, Jackson and Negron also testified that Roseboro was in the neighborhood nearly every day before Williams was killed, and Harmon said she still dropped him off there a few times after August 4. (Jury Trial Tr. Sept. 10 at 104:18–105:2, 147:22–149:21, 176:17–178:23; 120:4–121:5.)

[5]    Harmon further testified that Roseboro usually woke her up at 2:30 a.m. so she could leave for her 3:30 a.m. shift, but on August 4 she woke up late, between 3:00 and 3:30 a.m.; as she left the house, she saw Roseboro asleep. (*Id.* at 116:22–117:22.)

Roseboro's trial counsel Stephen Patrizio cross-examined each witness. All four admitted they knew of no problems between Roseboro and Williams, who had a positive relationship and even treated each other like family. (*Id.* at 132:20–133:8, 135:18–136:5, 173:14–174:3, 207:15–23; Jury Trial Tr. Sept 11 at 103:18–104:11.) To undermine the credibility and effect of testimony about Roseboro's conduct and statements on August 4, counsel highlighted Tyheem's use of PCP, a drug that affects memory and perception.[6] He also cross-examined Tyheem, Jackson and Negron on their prior statements to police.[7]

2

The prosecution called multiple police officers, including Philadelphia Police Detective James Dunlap, who presented the Commonwealth's timeline of events. Dunlap, who is trained to extract and store video data from DVRs and was responsible for retrieving the security footage, explained that DVR clocks are often inaccurate. (Jury Trial Tr. Sept. 10 at 17:3–20:16, 25:22–26:9, 29:7–16, 29:14–30:3.) As such,

---

[6]    None of the witnesses said they thought Tyheem was high during the August 4 conversation. He denied being "out of it," (Jury Trial Tr. Sept. 11 at 104:16–105:13), and although Jackson once described him as "zoned out," she also stated, when directly asked, that he didn't seem high, (Jury Trial Tr. Sept. 10 at 170:23–171:10, 172:20–23).

But counsel got Tyheem and Jackson to acknowledge that it would not be unusual to bar-hop between the two neighborhood bars that Jackson said Roseboro named. (Jury Trial Tr. Sept. 11 at 96:6–99:22, 106:19–108:5; Jury Trial Tr. Sept 10 at 170:11–172:11).

[7]    Jackson saw the security footage at a police station on August 4 but didn't identify Roseboro. (Jury Trial Tr. Sept. 10 at 162:23–167:3.) Nor did Tyheem or Negron, who were at the station on August 6, tell the police about the August 4 conversation with Roseboro. (Jury Trial Tr. Sept. 10 at 194:19–199:16; Jury Trial Tr. Sept. 11 at 91:21–92:14.)

Tyheem admitted on direct examination that he hadn't identified Roseboro on August 6, only doing so a month later after one of his uncles told him that he should tell the police the truth. (Jury Trial Tr. Sept. 11 at 65:4–68:3, 71:7–78:5.) He later explained that he hadn't done so because a different uncle told him the Williams family would retaliate and he shouldn't tell the police anything. (*Id.* at 62:15–93:19.) And Negron, on cross-examination, explained that she hadn't been shown the video or asked any questions on August 4 but identified Roseboro a month later when she was asked to watch the video. (Jury Trial Tr. Sept. 10 at 196:17–198:23, 202:5–203:7.)

whenever he retrieves video footage, he uses his smartphone to check the time on the surveillance against the Naval Observatory Atomic Clock. (*Id.* at 29:25–30:12.)  When he retrieved the video showing Roseboro and Williams together on August 4, he determined that the timestamp on that surveillance footage was 9 minutes and 55 seconds slow. (*Id.* at 30:13–17.)  In other words, when Roseboro and Williams walked off-screen at approximately 1:57:43 a.m., according to the timestamp, *see* (Prelim. H'rg Tr. at 83:22–84:9), the video actually displayed what occurred at 2:07:38 a.m.  And the four popping sounds, heard around timestamp 1:58:08, happened around 2:08:03 a.m. — almost two minutes before the 911 call at 2:09:44 a.m. (Jury Trial Tr. Sept. 10 at 23:12–14, 46:19–50:13.)  The time of the 911 call was recorded in the RADQ (Radio Assisted Data Query), a computer-generated list of all calls involving the police radio, dispatch or patrol car terminals, which Dunlap described as "extremely accurate" in its timekeeping. (*Id.* at 22:8–25.)  The RADQ also recorded officers immediately responding to the dispatch at 2:11:28, arriving on scene at 2:13:37 and finding Williams's body at 2:29. (*Id.* at 23:21–25:21; Jury Trial Tr. Sept. 9 at 108:23–109:6.)

Patrizio attempted to undermine Dunlap's proffered timeline in two ways.  He first focused on Detective Ron Dove's January 30, 2013 preliminary hearing testimony. Dove, the lead detective in this case, testified that the timestamp was "a little slow in comparison to realtime . . . . within minutes." (Prelim. H'rg. Tr. at 82:5–18.)  Counsel asked Dunlap whether he knew about Dove's testimony or whether Dove ever told him that he separately calculated the time differential. (Jury Trial Tr. Sept. 10 at 66:13–67:4.)  Dunlap said no. (*Id.*)  Second, counsel compared Dunlap's calculation to the RADQ times, pointing out that while the officers reported arriving at 2:13:37, the

timestamp on the video when they first appeared was 2:15:55. (*Id.* at 71:14–72:12.) Dunlap agreed that this would create a nearly three-minute differential based on the RADQ. (*Id.* at 72:13–25.) But he also explained that he didn't know what "on scene" meant, and the officers could have reported when they arrived in the area but outside the camera's view. (*Id.* at 72:25–73:5.)[8]

Patrizio also cross-examined Dunlap about the recorded audio accompanying the video. Dunlap had earlier testified that the microphone was located inside the store, on the side parallel to Brunner. (*Id.* at 36:3–21.)[9] Under cross-examination, Dunlap agreed the microphone was likely intended to record indoor conversations, such as during a robbery, and admitted that he didn't know anything about the quality or sensitivity of the microphone. (*Id.* at 67:20–70:3.) Counsel then played the video footage for a minute beyond the time the four popping sounds were heard, revealing two additional noises that Dunlap described as a "click" and a "light pop." (*Id.* at 76:8–77:3, 96:10–98:18.) He then played various surveillance video clips, revealing that the microphone didn't pick up a bouncing basketball outside, passing cars or conversation on the store's front steps. (*Id.* at 77:4–91:15.) On redirect, the video of Roseboro and Williams leaving the camera's view and the subsequent six sounds were played again for the jury. (*Id.* at 95:8–98:18.)

---

[8]     Officer Daniel Levitt, who along with his partner was dispatched to respond to the 911 call, testified to that effect the previous day, explaining that the RADQ arrival time could have been based on their use of the patrol car terminal or police radio and was not necessarily connected to their appearance on the video. (Jury Trial Tr. Sept. 9 at 102:5–104:2, 107:7–25.)

[9]     The jury heard the day before that the south side of a clothing donation bin on the Wayne Avenue side of the store was 119 feet from the alley where Williams's body was found, (Jury Trial Tr. Sept. 9 at 202:4–18), giving it a rough idea of how far the microphone was from the alley.

3

The jury deliberated for more than a day, twice requesting to watch the video from the time Roseboro appeared on camera through the six sounds recorded after he and Williams walked out of view.  (Jury Trial Tr. Sept. 15 at 2:1–6:5; Jury Trial Tr. Sept. 16 at 2:1–4:23.)[10]

On September 16, the jury found Roseboro guilty of first-degree murder and related firearms charges.  (Jury Trial Sept. 16 at 5:22–8:14.)  He was sentenced the same day.  (*Id.* at 12:5–19.)  The Pennsylvania Superior Court affirmed the judgment on appeal, *Commonwealth v. Roseboro*, No. 2833 EDA 2014, 2016 WL 903949, at *1 (Pa. Super. Ct. March 9, 2016), and the Supreme Court of Pennsylvania denied allocatur, *Commonwealth v. Roseboro*, 145 A.3d 164 (Pa. 2016).

B

On March 9, 2017, Roseboro filed a *pro se* petition for relief under Pennsylvania's Post Conviction Relief Act.  (PCRA Op. at 2, ECF No. 31-2.)  The court subsequently appointed counsel, who on October 10, 2018 filed an amended petition raising a variety of ineffective assistance of counsel and due process claims.  (*Id.* at 2–3.)  After holding an evidentiary hearing on November 25, 2019, to address two of the ineffective assistance claims, the PCRA court denied Roseboro's petition.  (*Id.* at 2.)  The Superior Court affirmed, adopting in full the PCRA court's decision, *Commonwealth v. Roseboro*, No. 123 EDA 2020, 2021 WL 2012602, at *2 (Pa. Super. Ct. May 20, 2021), and the

---

[10]    There was some discussion at trial concerning the volume at which to play the video, given that in-store conversations heard in the first clip played during Dunlap's testimony were overly loud. (Jury Trial Tr. Sept. 10 at 77:4–84:20.)  Counsel and the court eventually settled on a volume they considered "normal," (*id.* at 84:21–85:6), and when the jury reviewed the footage during deliberations, it was replayed at both the lowest and highest volumes used during trial, (Jury Trial Tr. Sept. 15 at 4:6–11; Jury Trial Tr. Sept. 16 at 2:1–7).

Pennsylvania Supreme Court denied allocatur, *Commonwealth v. Roseboro*, 283 A.3d 176 (Pa. 2022).

C

On August 24, 2022, Roseboro filed this petition *pro se*, asserting four claims of ineffective assistance of counsel.  He alleged Patrizio (1) failed to object to Tyheem's testimony about Roseboro's rumored killing of Williams as hearsay and to request a curative instruction; (2) failed to keep a promise he made in his opening statement to introduce evidence that Dove had previously testified to a different timeline; (3) failed to call Dove to testify or have his preliminary hearing testimony admitted as the prior statement of an unavailable witness; and (4) failed to investigate Dunlap's testimony or obtain an expert report from him prior to trial.  (Habeas Pet., ECF No. 2.)

On February 7, 2024, Judge Sitarski recommended denial and dismissal of all four claims.  (R&R, ECF No. 37.)  On the first, she found neither deficient performance nor prejudice, and on the remaining claims found that despite trial counsel's deficient performance, no prejudice resulted from any of his errors.  (*Id.*)

On June 17, 2024, Roseboro objected to the R&R.  (Objs., ECF No. 42.)  He first argues that the magistrate judge overlooked his argument that counsel should have requested a curative instruction with respect to the rumor that Roseboro committed the murder.  (*Id.* at 2–3.)  His remaining objections concern the magistrate judge's alleged errors in conducting the prejudice analysis given, as he sees it, that the weight of the evidence against him was not overwhelming.  (*Id.* at 3–11.)

II

A

28 U.S.C. § 2254 bars the Court from granting habeas relief on any claim that a state court has already adjudicated on the merits unless the state court's decision (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the" United States Supreme Court; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Clearly established" federal law consists only of "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions." *Andrew v. White*, No. 23-6573, 604 U.S. ---, slip op. at 5 (Jan. 21, 2025) (per curiam) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014)).

The "contrary to" clause permits a court to grant the writ if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). The "unreasonable application" clause permits a court to grant the writ if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* Finally, a decision is not based on an unreasonable determination of facts "'merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Wood v. Allen*, 558 U.S. 290, 301 (2010).

If a federal habeas court determines that a petitioner meets one of § 2254(d)'s exceptions, the court "must then resolve the claim without the deference [28 U.S.C. §

2254(d)] otherwise requires." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007). Similarly, "when a state court's rationale is less than clarion, it is permissible to sidestep AEDPA deference if the claim would fail under *de novo* review." *Hannibal v. Sec'y Pa. Dep't of Corrs.*, 2024 WL 1422015, at *7 (3d Cir. Apr. 2, 2024) (citing *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010)).

B

To succeed on an ineffective assistance of counsel claim, a petitioner must show that (1) his "counsel's performance was deficient," and (2) he suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Counsel's performance is deficient when it falls "below an objective standard of reasonableness." *Id.* at 687–88. Courts apply a "strong presumption" of reasonableness and should endeavor "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. The presumption of reasonableness can be rebutted "by showing either that the conduct was not, in fact, part of a strategy, or by showing that the strategy employed was unsound." *Thomas v. Varner*, 428 F.3d 491, 499–500 (3d Cir. 2005). Even where the presumption is rebutted, "a court must still determine whether, in light of all the circumstances, the identified acts or omissions of counsel were outside the wide range of professionally competent assistance." *Lewis v. Horn*, 581 F.3d 92, 113–14 (3d Cir. 2009) (cleaned up). And when "the record does not explicitly disclose trial counsel's actual strategy or lack thereof . . . the presumption [of reasonableness] may only be rebutted through a showing that no sound strategy . . . could have supported the conduct." *Thomas*, 428 F.3d at 500.

10

To establish prejudice, the petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). To determine the likelihood of a different outcome, the Court "must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695.

C

The standard pursuant to which the Pennsylvania Superior Court assessed the prejudice prong of Roseboro's claims is unclear. The court first stated that PCRA petitioners must establish, "by a preponderance of the evidence" that counsel's errors "so undermined the truth determining process that no reliable adjudication of guilt or innocence could have taken place," *Roseboro*, 2021 WL 2012602 at *2, then stated that prejudice requires demonstrating "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* (citation omitted). However, the court did not expressly address the merits of Roseboro's claim, concluding only that it found "no legal errors" in the PCRA court's opinion and adopted the opinion as its own. *Id.* It is thus unclear whether the court applied a preponderance of evidence or reasonable probability standard, so the Court will review Roseboro's claims *de novo*. *See Hannibal*, 2024 WL 1422015, at *7.

The Court reviews *de novo* the specific portions of the R&R to which Roseboro objects. 28 U.S.C. § 636(b)(1); *see also Cont'l Cas. Co. v. Dominick D'Andrea, Inc.*, 150 F.3d 245, 250 (3d Cir. 1998).

III

Roseboro's first claim is that trial counsel failed to object or request a curative instruction after Tyheem testified that he'd heard a rumor that Roseboro murdered Williams. (Pet. at 8.)[11]

The possibility that Tyheem would so testify first arose during a motion *in limine* hearing on September 10. The prosecutor explained that he intended to elicit testimony about the August 4 conversation and that, although he was willing to avoid the rumor testimony, he wanted the trial court to preclude Roseboro's statements denying the murder and explaining that he'd lost his own mother. (Jury Trial Tr. Sept. 10 at 2:9–4:11.) Defense counsel objected to the August 4 testimony in its entirety, but the trial court ruled that any testimony concerning Roseboro's own statements — either his whereabouts or his self-serving denial and explanation — was admissible. (*Id.* at 4:12–6:6.) But the court deferred decision on what Tyheem could say about the rumor that Roseboro killed Williams, stating that its admissibility could depend on the context. (*Id.* at 6:7–8:12.)

In front of the jury, the court asked Tyheem to clarify when Roseboro made a particular statement. (Jury Trial Tr. Sept. 11 at 60:24–25) Instead of answering the question, Tyheem explained why the August 4 conversation happened: "We was asking

---

[11]    Roseboro's petition included a claim that his PCRA counsel was ineffective for failing to raise this issue as not just ineffective assistance but also a violation of Roseboro's rights under the Confrontation Clause, though he subsequently withdrew that argument. (Supp. Reply at 2–3, ECF No. 34.)

him, we are hearing that you had something to do with my mom being killed.  I asked him." (*Id.* at 61:1–4.)  The court followed up by asking Tyheem for Roseboro's response, which he said was to deny the murder and explain that his own mom had died. (*Id.* at 61:5–15)  Defense counsel did not object to or move to strike the testimony about the rumor.  Nor did he request an instruction, either to prohibit the jury from considering the testimony at all or limit the jury's consideration of the rumor to its effect on Tyheem.

At the PCRA hearing, Patrizio admitted that his failure to object to the testimony was not based on any strategy.  (PCRA H'rg Tr. at 17:24–18:3)  He and counsel for the Commonwealth also indicated they viewed the trial court's prior ruling as a conditional one: if the testimony about the rumor was admitted, then Roseboro's self-serving statements would be as well.  (*Id.* at 15:4–10, 27:6–13.)

A

Counsel's admission of a lack of strategy rebuts the presumption of reasonableness.  *See Thomas*, 428 F.3d at 499–500.  Nonetheless, the Court must determine whether his conduct, "in light of all the circumstances," falls within the "wide range" of competent assistance.  *Lewis*, 581 F.3d at 113–14 (citation omitted).  Under this deferential review of his performance, counsel's failure to object or request a jury instruction was not deficient.

As counsel testified, this portion of Tyheem's testimony was a mixed bag for Roseboro.  If the trial court's ruling had been conditional, it would not have been unreasonable for an attorney to believe, at the time, that the favorable testimony outweighed the harm.  This is especially true in the circumstances of this case, where

13

counsel could reasonably have concluded that Roseboro's denial and explanation bolstered the strategic choice to emphasize the lack of any evidence of motive and the testimony that Roseboro and Williams had a mother/son relationship.  *See* (Jury Trial Tr. Sept. 9 at 39:1–40:3; Jury Trial Tr. Sept. 12 at 47:8–49:3).  Even if the trial court's ruling was not conditional, objecting to it may not have been successful, given the court's position that it might find the testimony was offered for its effect on Tyheem, the listener.  (Jury Tr. Transcript Sept. 10 at 7:15–18.)  And Tyheem was testifying on the fourth day of a very contentious trial.  *See* (Jury Tr. Transcript Sept. 12 at 68:11–15, 133:16–25.)  Given this background, counsel could reasonably have decided not to object.

And courts frequently acknowledge that not requesting a limiting instruction is a reasonable strategy to avoid drawing attention to the issue.  *See, e.g.*, *Albrecht v. Horn*, 485 F.3d 103, 127 (3d Cir. 2007) (noting this strategy for evidence of prior bad acts); *Khan v. Gordon*, No. 11-7465, 2013 WL 4957479, at *7–8 (E.D. Pa. Sept. 12, 2013) (noting this strategy for evidence admitted under the state-of-mind hearsay exception).  Despite the strong presumption that juries follow instructions, *see United States v. Franz*, 772 F3d 134, 151–53 (3d Cir. 2014), asking the jury to be instructed to consider the rumor only for its effect on Tyheem — or requesting a specific instruction to disregard the testimony entirely — risked emphasizing for the jurors an issue that had its downside for Roseboro.  Thus, although counsel could not articulate a strategic reason for not objecting or requesting a jury instruction, his performance still fell within the wide range of competent assistance.

14

B

Even if counsel's failure to object or request an instruction constituted deficient performance, Roseboro cannot demonstrate a reasonable probability that, but-for this error, the trial would have turned out differently.

The jury heard undisputed evidence that roughly thirty minutes after she was last seen with Roseboro, Williams's body was found with four gunshot wounds in an alley fifty-five feet away.  The jury saw the video in which Roseboro and Williams walked in the direction of that alley, and heard, thirty seconds after Roseboro and Williams walked off-camera, four sounds consistent with gunshots.  Jurors heard Dunlap's testimony about the time differential, which would place their walking off camera together within two minutes of the 911 call reporting gunshots and a woman screaming in an alley near Wayne and Brunner.  And it heard a variety of circumstantial evidence about Roseboro from the lay witnesses, including his mood when Harmon last saw him; his lack of alibi and shifting responses when confronted; and that he rarely, if ever, returned after Williams was killed to the block where he previously dealt drugs.

IV

Roseboro next argues that his trial counsel failed to fulfill a promise he made to the jury in his opening statement that it would hear evidence that Dove's preliminary hearing testimony offered a different timeline of the events surrounding the murder. (Pet. at 10.)  Roseboro claims that, had counsel kept this promise by introducing Dove's preliminary hearing testimony, the jury would have heard evidence that challenged the Commonwealth's theory that only two minutes passed between the four popping sounds

recorded in the video and the 911 call, which might have led a reasonable juror to doubt that those sounds were gunshots.  *Cf.* (Pet. at 70–71.)

In his opening statement, counsel made a number of representations about what the evidence would and wouldn't show.  (Jury Trial Tr. Sept. 9 at 37:1–43:5.)  One of those concerned the Commonwealth's timeline of the murder:

> [W]hat has happened here, ladies and gentlemen, is that the evidence will show [] that there is going to be a little shifting, and a retailoring, and a little bit of overreaching by the Commonwealth in terms of the time that is displayed on the video and the time that the police arrived in response to the gunshots.  So that they are going to try to suggest to you that the period of time is within seconds of their being together and it is really many, many minutes.  I make that promise to you, as well.  Why?  Because the assigned detective . . . testified at a prior hearing . . . and said that he retrieved the videotape . . . and he checked the video-recorder for his time and it was off only a minute or two.  The problem is that doesn't fit within their scheme.  So, they are going to have another witness come in and tell you that the videotape time on the camera is 9 minutes and 55 seconds off to bring it in close proximity to the 911 call[.]

(*Id.* at 40:4–41:19.)  In essence, counsel told jurors they would see that the Commonwealth's timeline of the murder was untrustworthy because Dunlap's timeline differed from Dove's.[12]  But counsel never called Dove as a witness, nor sought to have him declared unavailable so that his preliminary hearing testimony could be admitted into evidence.  He instead cross-examined Dunlap about Dove's preliminary hearing testimony and conversations Dove and Dunlap may have had:

> Q: So you have no information that Detective Dove made his own calculations of the time differential between realtime and the time on the recorder?
> A: No.

---

[12]    Precisely what he promised is unclear.  For instance, based on the evidence at trial, the "period of time" he referenced must be the one between Roseboro and Williams being together and the gunshots, not their being together and the officers' arrival: only the former period is the crucial one, and the latter is at least six minutes, under even Dunlap's timeline.  But what is clear is that counsel assured the jury it would see that a detective previously testified to a different timeline, one that provides a longer gap between events than the Commonwealth was now arguing.

. . . .

Q: If he has testified previously, he said I don't have the exact calculations but it was a little slow in comparison to realtime, I would say a little, it was within minutes off, he didn't share any of that information with you; correct?

A: Correct.

(Jury Trial Tr. Sept. 10 at 66:13–67:4.)  Before closing statements, the prosecutor moved to preclude defense counsel from talking about Dove's preliminary hearing testimony, arguing that Dove's statements were never put into evidence; counsel instead purportedly quoted Dove in asking his questions.  (Jury Trial Tr. Sept. 12 at 11:15–12:6, 13:2–6, 16:19–17:2.)  Patrizio argued the statements came into evidence through his questions to Dunlap and that realistically, Dove would not respond to a subpoena.  (*Id.* at 12:7–16, 15:16–20, 19:24–20:2.)  The trial court acknowledged that typically, when a witness testifies at a prior proceeding, he must then testify at trial or be declared unavailable before his prior testimony can be admitted as evidence.  (*Id.* at 18:3–20:8.)  Nonetheless, it allowed counsel to discuss Dove's preliminary hearing testimony in his closing argument.  (*Id.* at 20:6–21:24, 22:18–23:12); *see also* (*id.* at 67:12–68:9).

## A

Instead of calling Dove as a witness, subpoenaing him to testify or having him declared unavailable such that he could get Dove's preliminary hearing testimony into evidence, Patrizio assumed instead he could rely on his own use of Dove's statements when cross-examining Dunlap.  But, as the court instructed the jury before testimony began, attorneys' questions are not evidence.  (Jury Trial Tr. Sept. 9 at 13:8–15:3.)  Counsel was allowed to cite to Dove's "statements" in his closing, but he failed to deliver what he promised when the trial began — that the jurors would hear evidence that

17

Dunlap offered a different timeline than the one the assigned detective, Dove, previously testified to.

Breaking a promise made during an opening statement does not necessarily constitute deficient performance. *Elias v. Superintendent Fayette SCI*, 774 Fed. App'x 745, 751 (3d Cir. 2019).[13]  Counsel's broken promise, however, was not a strategic decision based on an unforeseen development, *see id.*; it was a mistake based on an error of law.  And in light of the circumstances of this case, his conduct was not reasonable.  One of the defense's primary strategies was to attack Dunlap's timeline in order to increase the time between when Roseboro and Williams were last seen on the video and the 911 call.  This strategy could be carried out in two ways: using the RADQ record to suggest the timestamp is several minutes fast or calling Dove to testify that he thought the timestamp was only a few minutes slow.  Both offer different alternative timelines, but they could, individually or together, be used to argue that the jury should doubt Dunlap's timeline.  Once Patrizio chose to use both, there was no sound reason for failing to introduce evidence he told the jurors they would hear and formed part of that defense.  *Cf. Moore v. Sec'y Penn. Dep't of Corrs.*, 457 Fed. App'x 170, 182 (3d Cir.

---

[13]      The statement in *McAleese v. Mazurkiewicz*, 1 F.3d 159, 166 (3d Cir. 1993) that a broken promise is "sufficient of itself to support a claim of ineffectiveness" does not resolve Roseboro's claim. That blanket pronouncement is *dictum*, not supported by the cases it cites and contradicted elsewhere in the opinion.  *See Elias v. Coleman*, No. 14-1337, 2017 WL 5192476, at *21 n.12 (W.D. Pa. Nov. 9, 2017) (discussing *McAleese*). The Third Circuit has since cited this part of *McAleese* for the proposition that broken promises *can* constitute ineffective assistance, not that they necessarily do.  *See Elias*, 774 Fed. App'x at 751.

2012) ("Counsel's failure to introduce evidence that contradicts a key witness's trial testimony is patently unreasonable.").

## B

Roseboro cannot, however, demonstrate prejudice. First of all, his lawyer never promised the jury it would hear evidence from a specific witness, such as Dove himself. *See McAleese*, 1 F.3d at 166–67 (noting the rationale for finding ineffective assistance is that jurors might "think the witnesses to which counsel referred . . . were unwilling or unable to deliver the testimony he promised"). The issue was the substance of Dove's preliminary hearing testimony and the effect it might have had on the jury. Accepting Dunlap's timeline creates a narrow window favorable for the Commonwealth: Roseboro and Williams walk off-camera at 2:07:38 and two minutes later, at 2:09:44, the police receive a 911 call reporting gunshots and a woman screaming in an alley near Wayne and Brunner. Dove's assessment increases the time between these two events to approximately seven minutes, which, Roseboro argues, could affect whether a reasonable juror would conclude the sounds on the video were gunshots.[14]

Roseboro's argument is not implausible, but it does not demonstrate a reasonable probability of a different outcome. *See Harrington*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable.") No possible variation on the timing of the 911 call changes the fact that, thirty seconds after Roseboro and Williams walked off-camera, four sounds consistent with gunshots were recorded, and less than thirty minutes after that, Williams's body was found with four

---

[14]     Because Dove never provided a specific calculation, Roseboro's argument is predicated on the belief that Dove's testimony would have shown the gunshots occurred four to seven minutes before the 911 call, (Reply at 24, 38, ECF No. 18.)

gunshot wounds in an alley fifty-five feet beyond the camera's view, in the direction she and Roseboro had been walking.  Although placing the 911 call within two minutes of the recorded sounds does bolster the Commonwealth's case, the other evidence against Roseboro was substantial, consisting not just of the video but the witnesses' testimony, which indicated, *inter alia*, that Roseboro was aggressive when his girlfriend last saw him between midnight and 1 a.m.; that he changed his story while talking to neighbors; and that he largely, if not completely, stopped coming to the neighborhood, even though he previously sold drugs there.  Even assuming the jury accepted Dove's testimony in some manner — as evidence that the 911 call was placed five minutes later, relative to the alleged gunshots, than Dunlap believed or instead, perhaps in combination with the RADQ argument, as evidence that the timeline of events was too muddy to resolve — there is no reasonable probability that, in light of the totality of the evidence, the outcome at trial would have been different had the jurors learned what Dove testified to at the preliminary hearing.[15]

## V

Roseboro's third claim is that his counsel's failure to subpoena or call Dove as a witness or have him declared unavailable so that his preliminary hearing testimony could be admitted as evidence constituted ineffective assistance.  (Pet. at 12.)

Roseboro's argument here is effectively the same as it was with respect to the prior claim: counsel failed to introduce Dove's preliminary hearing testimony because

---

[15]    Not that Dunlap's timeline was unimpeachable; no one at trial offered an explanation for the seeming discrepancy between Levitt's partner leaving the camera's view at 2:19:58, which would be 2:29:53 under Dunlap's calculations, and the RADQ report that Williams's body was found at 2:29. (Jury Trial Tr. Sept. 9 at 70:1–71:5, 108:23–109:6.)  But given the evidence as a whole, the jury did not need to find that Dunlap's timeline was correct, or choose between competing timelines, to find Roseboro guilty beyond a reasonable doubt.

he misunderstood the law and there is a reasonable probability that introducing this evidence would have affected the outcome. As discussed above, no reasonable strategy supports failing to proffer evidence supporting a defense counsel believed critical. *See* Section IV.A.2. Nonetheless, in light of all of the evidence against Roseboro, counsel's failure was not prejudicial. *See* Section IV.B.

## VI

Roseboro's final claim alleges that his lawyer's failure to obtain an expert report or otherwise investigate Dunlap's testimony prior to trial constituted ineffective assistance. (Pet. at 13–14.)

## A

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The decision not to investigate is "assessed for reasonableness in all the circumstances." *Id.* Here, Patrizio learned that Dunlap would be testifying shortly before a motion hearing on August 21, 2014, three weeks before trial. (Mot. H'rg Tr. at 35:1–38:9.) At the time, he told the trial court that he had received nothing from or about Dunlap. (*Id.* at 38:13–17.) Yet his subsequent conduct suggests he took no steps to investigate, waiting until Dunlap was testifying at trial to ask whether he'd prepared a report and if he could have a copy of it. (Jury Trial Tr. Sept. 10 at 62:13–16.) Dunlap explained that all he had was a single page of notes, typed in August of 2012, and the court briefly recessed so counsel could review those notes before resuming cross-examination. (*Id.* at 62:17–65:19.)

Counsel had made the timeline a key part of the defense and believed that Dove's testimony was "critical" to that strategy. He also intended to cast doubt on Dove's conduct during the investigation. *See* (Mot. H'rg Tr. at 39:11–18.) Given these strategic choices, it was unreasonable for Patrizio to not take steps to inform himself, as best he could, of Dunlap's possible testimony and role in the investigation.

B

But no prejudice resulted from this shortcoming. Patrizio was not caught unawares as to the substance of Dunlap's testimony or how he might undermine it. His opening expressly referenced the Commonwealth's nine minute, fifty-five second time difference, and Dunlap's testimony was independent of counsel's opportunity to rely on other evidence he already knew about, including the RADQ or Dove's testimony. Moreover, counsel thoroughly cross-examined Dunlap on each aspect of his testimony. *Compare* (Jury Trial Tr. Sept. 10 at 26:12–39:20; 22:8–25:21, 29:7–30:23; 35:6–36:21) *with* (*id.* at 61:20–67:13; 66:13–67:4, 71:14–73:25; 68:5–70:3, 76:8–94:8.) And while Dunlap was qualified at trial as an expert witness in the field of forensic video technology, (Jury Trial Tr. Sept. 10 at 21:18–20), no expertise was necessary to rebut his testimony concerning the time differential. Counsel's failure to better prepare did not impact his ability to address Dunlap's testimony at trial, and no pre-trial investigation into that testimony would have affected the jury's evaluation of the key component of the video evidence: Roseboro walked with Williams out of view of a security camera thirty seconds before four sounds consistent with gunshots were heard, and Williams's body was shortly thereafter found with four gunshot wounds in an alley fifty-five feet away from where she was last seen with him. In the face of this evidence

and all the other testimony, there is no reasonable probability that Patrizio's failure to investigate Dunlap's opinion and role in the case affected the outcome of the trial. [16]

VII

A certificate of appealability should only be issued if the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  The petitioner must "demonstrate that reasonable jurists would find the District Court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Roseboro has made no such showing, so no certificate should issue.


An appropriate Order follows.


BY THE COURT:



*/s/ Gerald J. Pappert*

Gerald J. Pappert, J.

---

[16]     To the extent Roseboro's fourth objection, which states that counsel's errors "permeated" trial, (Objs. at 8, 11); *see also* (Supp. Reply at 6) (referencing "accumulated errors"), can be read to state a claim for cumulative error, he failed to exhaust this claim in state court and cannot raise it now.  *See* § 2254(b)(1); *Collins v. Sec'y of Pa. Dep't of Corrs.*, 742 F.3d 528, 541–42 (3d Cir. 2014) (holding cumulative error is a separate claim that must be exhausted in state court).  Even if Roseboro had exhausted this claim, he could not obtain habeas relief.  There is no indication that his lawyer's error in not investigating Dunlap prejudiced him, and there is no reasonable probability that the combined effect of his errors, if any, with respect to Tyheem's testimony and Dove affected the outcome of trial given the evidence against Roseboro.